James VARNADO, Plaintiff-Appellant,

v.

OCEAN DRILLING & EXPLORATION COMPANY, Defendant-Appellee,

Badeaux, Discon, Cumberland & Barbier, Intervenors-Appellants.

No. 76–1917.

United States Court of Appeals,
Fifth Circuit.

Dec. 17, 1979.

Gothard J. Reck, New Orleans, La., for Varnado.

Carl J. Barbier, New Orleans, La., for intervenors.

James H. Daigle, New Orleans, La., for defendant-appellee.

Before WISDOM, GODBOLD and TJOFLAT, Circuit Judges.

GODBOLD, Circuit Judge:

Plaintiff Varnado, a seaman on a drilling barge, was injured March 6, 1971, when he fell in the mud room of the vessel. Varnado, then not quite 23 years old, was working as a roustabout in his first offshore job and had been at work only a few days.

Varnado sued his employer under the Jones Act and general maritime law alleging negligence and unseaworthiness. In a trial in 1974 a jury returned Rule 49(a) special verdicts finding that defendant was liable to Varnado and that Varnado was damaged in the amount of $100,000 but was 50% contributorily negligent. Judgment was entered for Varnado for $50,000.

Defendant moved for judgment n/o/v and for new trial, and the court granted the new trial motion without statement of reasons.

In 1976 a second jury trial was held. Plaintiff contended that drilling gel was brought into the mud room in paper sacks, some of which were torn causing gel to leak out onto the floor, that the gel mixed with water and collected in indentations on the floor, which caused the floor to be slippery and brought about plaintiff's fall. Defendant asserted plaintiff was contributorily negligent for several reasons, including that one of his duties was to help keep the floor clean and dry and that he failed to do so. During closing argument plaintiff's counsel addressed several jurors by name and made requests of them as follows:

Mr. Olivier, you are an architect, sir, you know about stress on steel. You tell your fellow jurors when you are in there about how they have indentations on mud room floors.

And Mr. Duhe, you are a lab technician, you work for Shell Chemical Company, sir, you tell them what happens to drilling gel when it's mixed with water and how difficult that is to clean up when you try.

And Mr. Gaudet, you've worked with a bag company for twenty-five years, sir, you tell your fellow jurors what happens when you put substances in paper bags and how they tear and there is nothing that can be done.

There is no doubt, ladies and gentlemen, liability is proved.

T. 523.[1]

A few minutes later, plaintiff's counsel addressed another juror, Professor Honore,

---

[1]  A couple of sentences later counsel addressed another juror by name:

But, what you have seen today was one of the oldest tricks in the book. You see, Mrs. Porbes, it's a case of trying the dead man, rather than the killer. The Defendant, a very skillful attorney, hired by a very large corporation, put the Defendant on the stand and he is going to try Varnado, he is going to try Varnado before you, to make you have a cloud before your eyes.

T. 523–24.

concerning the testimony of Professor Goodman, plaintiff's economic expert, as follows:

Professor Honore, I notice you pay particular attention, sir, to Professor Goodman, perhaps you have something in common. In the lost wages, sir, when he computed the lost wages of a man that was discharged from April 9th, 1971 to the date of this trial, he did it on a very scholarly basis and I noticed, with particularity, how you were following, sir.

I ask you to help your fellow jurors in computing lost damages and lost wages. Dr. Goodman assessed lost wages at thirty thousand four hundred and eighteen dollars and seventeen cents. The lost wages of the future, which, remember, no one is contending here, that Mr. Varnado cannot work. I didn't say that. Counsel is trying to imply that I said that.

Mr. Varnado, we think, can get a job, but at a minimum wage and I made sure that Dr. Goodman, Professor Honore—

T. 529. The court called counsel to the bench and held a bench conference. The court asked defendant whether it had any motions to make. Defendant orally moved for a mistrial. After a brief colloquy, the court said:

Accordingly, now, I will grant the motion for a mistrial.

However, I will order Counsel to continue and we'll submit the case to the Jury as well.

T. 531. The conference ended, and plaintiff's counsel resumed his jury argument. When the judge instructed the jury, after a few opening remarks, he said:

Now, in this case, ladies and gentlemen, we have had an unusual occurrence during argument which I must comment upon and that is, that counsel had addressed almost each member of the jury individually by name. Now, this is an improper practice.

MR. DAIGLE [attorney for defendant]:
Your Honor, I must say, I did not do that.

THE COURT:
I understand.

Counsel for one of the parties has addressed various members of the jury by name and this is an improper practice. As a result of this, the Court called counsel to the Bench and certain action was taken. The reason it's improper is that it puts an undue burden on any of you to ask you individually to take some action. I, therefore, caution you not to allow this addressing of you individually by counsel in any way to affect your discharge of your duty in considering the facts and applying the law as set forth in these instructions. Disregard it all together. As the jury, each of you is to deliberate on the facts as you heard them in the courtroom and the evidence that you received from the law. You are all to deliberate without any undue burden being put on you individually with regard to any particular fact or factor in the case. You are not to consider or single out any one part of the instruction as stating the law as a whole or, stating the law, but rather you are to consider the instructions as a whole.

Neither are you to be concerned with the wisdom of any rule of law stated by the Court, regardless of any opinion that you may have concerning what the law ought to be. It would be a violation of your sworn duty as jurors to base a verdict on any view of the law other than that set forth in these instructions, just as it would be a violation of your sworn duty to base your verdict on any facts, other than those brought out from the witness stand and from exhibits that have been entered into evidence in this courtroom.

Rec. V, pp. 3–5. The jury returned a verdict for the defendant, and the court entered judgment thereon.

Varnado appeals, objecting to the granting of a new trial and to the continuation of the second trial to verdict and judgment after the judge told counsel he was granting a mistrial.

### A. The motion for a new trial

We are hampered in reviewing the district judge's order because of its unillumi-

nating nature. It consists of only a type-written notation that the motion for new trial is granted. The motion asserted several grounds: failure to grant a directed verdict on the grounds of insufficient evidence of both negligence and unseaworthiness and failure to prove that plaintiff's slipping and falling was the proximate cause of his back injury; failure to prove loss of wages as an element of damages [and, impliedly, that this caused an excessive award of damages]. Because of the form of the judge's order we review all the grounds asserted.

The evidence of injury and of proximate cause was sufficient to submit to the jury under *Boeing v. Shipman*, 411 F.2d 365 (CA5, 1969) (en banc). We look first at injury. Plaintiff's co-worker Hebert saw him slip and go down. Hebert described the floor as wet and slippery, with water collected in indentations that were not supposed to be there. As Varnado described it, he slipped and fell across the tongue of a cart, pulled by him and pushed by Hebert, and was thrown into an iron beam. He attributed the fall to a combination of the wet and slippery floor and the fact that the wheels on the car would not roll. He stated that he and Hebert had to move the car loaded with 2400 pounds of sacked gel by sliding it. Suddenly, for the first time it began to roll, Varnado's feet slipped because of the gel and water on the floor, and he fell. There was other testimony that the wheels on the cart operated properly, but the testimony we have described created a jury issue.

Next we look at proximate cause. Varnado kept on working after his fall and made no complaint until four days later when he mentioned his back to Hebert. On September 12, six days after the accident and the last day of his hitch on the barge before going ashore, he reported the accident to his supervisor. The defendant sent him to the hospital immediately. Dr. Raymond E. Horn saw plaintiff, found tenderness in his back muscles, and put him on light duty. Dr. Horn saw Varnado again on March 30 and found him still having low back pain. On April 15 Dr. Horn thought that plaintiff could resume his full, regular

work and returned him to usual duty. He saw plaintiff again in October 1971 and May 1972 and both times thought he could perform work like that he had been performing when hurt. He found no muscle spasm at any time and no atrophy.

According to plaintiff, his back began hurting right after the accident, but he thought it would get all right and did not really feel the effect of it until the following Wednesday. After Dr. Horn examined him he stayed in bed for a week. He returned for two more seven-day hitches, during which he did light work. He tried to lift 100-pound sacks of gel but was not able to continue doing this. Hebert testified that after Varnado returned to work he lifted only one or two sacks.

After Dr. Horn returned Varnado to regular duty (April 15), Varnado reported for regular duty but did no work because he developed a sore throat and was sent to the hospital, which sent him home. While there he received notice that he had been discharged because his work was not satisfactory.

There was no evidence of preexisting injury or of a second injury after September 6.

The evidence was adequate to make a jury issue on proximate cause.

This leaves the ground of excessive damages. The record of the first trial filed with us does not include the testimony of Varnado's actuary. Plaintiff's counsel represents that the actuary testified to loss of wages from the date of trial, discounted to that date, of $155,750, based upon the minimum wage over a life expectancy of 34.6 years. For purposes of this decision we assume that the actuary did testify as represented.

The optimum testimony of injury came from Dr. Raeburn Llewellyn, a neurological surgeon. He first saw plaintiff in April 1972 at the request of Varnado's family doctor because he was not improving despite post-injury treatments. He found muscle spasms and thought Varnado was not sufficiently improved to return to work

of the type he had been doing when hurt. He hospitalized Varnado and gave two myelograms that he found to be in normal limits, and a discogram of the lowest joint in the back; it disclosed no injury. From objective and subjective symptoms he was of the opinion that something was wrong with Varnado's back.

Dr. Llewellyn last saw Varnado in December 1973. He had muscle spasms objectively manifested, numbness in one leg, and slight atrophy of one leg. Other testimony by Dr. Llewellyn was as follows:

Q  Dr. Llewellyn, considering all of the examination and treatment and findings you have with respect to Mr. James Varnado, can you tell us in accordance with reasonable medical certainty what his prognosis would be for the future or what your plans are for him in the future?

A  I continue to feel that this patient could not remain reasonably comfortable attempting a full, unlimited job assignment and one that required heavy lifting, jumping or climbing activities. I feel that he should be re-evaluated by the orthopedist and the neurosurgeon on a hospitalized basis to allow a more accurate, specific diagnosis as to what is his post injury problem and allow definitive treatment to be instituted for that, which in turn would hopefully allow improvement of a type or magnitude that would allow him to be rehabilitated, perhaps to a job assignment that required alternate sitting and standing, some modest bending and lifting activities.

Q  Based upon reasonable medical certainty, are you of the opinion now that Mr. Varnado cannot return to work which involves lifting 100 pound sacks of drilling mud?

A  That's my opinion, yes.

Rec. IV, pp. 25–26.

Q  Dr. Llewellyn, you're reasonably medically certain that Mr. Varnado could not return to a job which requires him to lift, bend or pull greater than 100 pounds, is that a fair statement of your opinion?

A  Yes, sir, that's my opinion. My problems have been that an exact diagnosis has not been established, in my judgment, at least, to allow me then to speculate as to what kind of treatment should be offered for a specific medical problem.

Rec. IV, p. 27.

THE COURT: Perhaps I can cut through this, gentlemen.

Doctor, do you have a sufficient diagnosis of Mr. Varnado's condition so that you can express, at this time, with reasonable medical certainty what treatment will be required in his case?

THE WITNESS: No, sir.

THE COURT: That answers the question.

Rec. IV, p. 28.

Q  Doctor, assume that a man has a low back pain for three and one-half years and further assume, based on your examination and treatment, that he has the same symptoms and objective findings that you found from Mr. Varnado, what would you recommend as treatment based on reasonable medical certainty?

A  I feel that the patient should have hospitalization, very specific tests accomplished again and have orthopedic and neurological evaluation on a hospitalized basis.

Q  Do you feel that Mr. Varnado should be rehospitalized, Doctor?

A  Yes.

Rec. IV, p. 29–30.

Q  And yet you recommend another myelogram, do you, sir?

A  Yes, sir. This is in respect for the fact that he continues now some eighteen months after these studies, to have, in my judgment, an undiagnosed post injury problem of his back.

Rec. IV, p. 31.

Q  So the question was, Doctor, you have not found any nerve root involvement, disc disease in this man as of this date?

＊　　＊　　＊　　＊　　＊　　＊

THE WITNESS: The answer is yes.

BY MR. HEBERT:

Q  You have?

A   Yes, sir.

Q   All right. Was it shown up in the myelograms?

A   I could not make a definitive diagnosis on the basis of the myelograms.

Q   Upon what basis do you find that there is nerve root involvement and upon what basis did you find, Doctor, that there is disc involvement?

A   I had answered your question as to nerve root involvement as yes. There was, on one occasion, some difference in the measurements of the muscles of the leg, which I, in my previous statement, had stated could well represent nerve root irritation of type and of duration that would indicate atrophy. When asked on a yes or no basis, then I had to answer that as yes.

Rec. IV, pp. 40–41.

We give Dr. Llewellyn's testimony its maximum possible effect in considering both diagnosis and prognosis. He describes Varnado as having an undiagnosed post-injury problem with his back, "something wrong with it." Varnado has atrophy in one leg that "could well represent" nerve root involvement. Dr. Llewellyn did not find a ruptured disc. He recommends further hospitalization and testing. There has not been a sufficiently exact diagnosis of a specific medical problem for him to have an opinion as to treatment. The closest Dr. Llewellyn came to a prognosis were his responses, at Rec. IV, pp. 25–26, quoted above, that Varnado could not "remain reasonably comfortable doing heavy lifting (etc.)" and that he could not return to work that involves lifting, bending or pulling more than 100 pounds.

Varnado has a ninth grade education. Before he was employed by defendant he had earned in:

| | |
|---|---|
| 1967 | $1,090 |
| 1968 | 3,000 (approx.) |
| 1969 | 3,400 ( " ) |
| 1970 | 3,755 ( " ) |

Working for defendant he made the minimum wage, $2.44 per hour. Since he was discharged by defendant, he has done various work. He assisted his father, a farmer, by paying bills for him and writing for him. Also he helped his father pen his cows, helped him on farm equipment such as discs and harrows, drove a tractor, and helped put up fences. For this his father paid his light and gas bills and some of his doctors' bills. He worked for his uncle some during 1973 doing cleanup work after his uncle would finish a house, and his uncle paid him "what he could afford." He also drove a two-and-a-half ton truck for his brother, delivering materials to construction jobs and then he would unload the lighter items. His brother also paid him "what he could afford." Varnado told Dr. Llewellyn that he worked at odd jobs at times, depending on his degree of comfort and availability of light job assignments. (Rec. IV, p. 38.)

Summarizing, there is no substantial evidence that Varnado's disability is permanent. At the time of trial his injury remained undiagnosed. There is no evidence that a condition of the general nature from which he suffers, and extending over the time he has had it, though not specifically diagnosed, is likely to be permanent. His earnings prior to the injury never exceeded $3,800 per year. As a roustabout for defendant working full time he would have earned in the neighborhood of $7,200 a year, but he was discharged from this employment for, as far as this record shows, reasons unrelated to the accident. Since the accident he has worked part-time doing light work, but the amount of his earnings has not been proved.

We hold that granting a new trial on the ground of excessive damages, if that was the ground,[2] was not reversible. Considering a motion based upon grounds of excessive damages, our review is solely of whether the district judge "abused" or misused his discretion. No such finding can be made in this case. Also, whether a remitti-

---

2.   While not determinative, it is worth noting that Varnado urges that excessive damages was the district judge's ground.

tur should be ordered, or a full new trial, or only a retrial on damages, are matters of discretion for the trial judge. We may not substitute our judgment for his.

### B. The second trial

From our reading of the record it is apparent that after plaintiff's counsel improperly called on jurors to decide the case on grounds other than the evidence presented, the district judge had in mind that the trial should continue but that he would set aside any verdict rendered for the plaintiff. The use of the term "mistrial" was unfortunate, because normally it implies that the trial come to an end forthwith, but we decline to be hypnotized by the word. As soon as the judge made the initial statement quoted above—that he would grant the motion for a mistrial but would permit the trial to continue—the bench conference ended and, with no objection from plaintiff's counsel, proceedings in open court were resumed with plaintiff's counsel continuing and completing his oral argument. The trial moved on to a conclusion in the normal manner, and it was only after verdict that plaintiff made the argument that all proceedings after the judge's initial statement were of no legal effect. Under all of these circumstances, if there was error, it was waived.

The district judge did not err in his conclusion that the remarks to the jury were improper. Pretermitting whether merely calling jurors' names was improper, it is inarguable that it is both improper and prejudicial to ask jurors to consider matters not in evidence and to urge them upon their fellows as well. Nor did the court err in instructing the jury by calling their attention to the incident and cautioning them not to let it affect them.

The verdict of the jury in the second trial must bring this dispute to a close.

AFFIRMED.